**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-02835-NYW

LILAFERN KADINGO,

     Plaintiff,

v.

LYNN A. JOHNSON, in her official capacity as director of the Jefferson County
Department of Human Services, and
SUSAN E. BIRCH, in her official capacity as Executive Director of the Colorado
Department of Health Care Policy and Financing,

     Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

     This matter comes before the court on Plaintiff Lilafern Kadingo's ("Plaintiff" or "Ms. Kadingo") Motion for Summary Judgment [#65, filed Mar. 10, 2017] and Defendants Lynn A. Johnson and Susan E. Birch's (collectively, "Defendants") Motion for Summary Judgment [#66, filed Mar. 10, 2017]. The motions are before the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c) and the Order Referring Case dated January 29, 2016 [#16]. After carefully considering the motions and associated briefing, the entire case file, the applicable case law, and the comments offered during the June 15, 2017 Motions Hearing, the court hereby **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment for the following reasons.

# MATERIAL FACTS

Plaintiff is a ninety-three (93) year old woman who "is incapacitated with dementia and physical disabilities." *See generally* [#65 at Movant's Statement of Material/Undisputed Facts ("SOMUF") ¶ 3; #65-3 at 2; #66 at Statement of Undisputed Facts ("SOUF") ¶ 9; #68 at 1]. Plaintiff currently resides in a nursing home in Thornton, Colorado, and her son, John Kadingo, "holds a durable power of attorney for [her]." [#65 at SOMUF ¶¶ 1–2; #66 at SOUF ¶ 9]. Plaintiff's husband, Hubert Kadingo ("Mr. Kadingo"), passed away on May 16, 2011, and through his will, he devised one-half of his estate via the Lilafern Kadingo Trust (the "Trust") to Plaintiff and one-half via a separate trust to his children. [#65 at SOMUF ¶¶ 3–4; #66 at SOUF ¶¶ 10–12].[1] The Trust is a pure discretionary trust that granted sole and absolute discretion to the trustee (John Kadingo) regarding distributions to Plaintiff, the sole beneficiary of the Trust. [#65 at SOMUF ¶ 5; #66 at SOUF ¶¶ 13–15].

In November 2011, InnovAge prepared and filed a Medicaid application on behalf of Plaintiff as her authorized representative. [#65 at SOMUF ¶¶ 9–10; #66 at SOUF ¶ 16]. At the time of filing Plaintiff's Medicaid application, "Plaintiff's only asset was the residence, as an exempt homestead under 10 CCR 2505-10, 8.100.5.M.2.a, based on intent to return, not whether Plaintiff was able to live there." [#65 at SOMUF ¶ 11].[2] The Colorado Department of Health Care Policy and Financing ("CDHCPF") subsequently approved Ms. Kadingo's application for long-term care services beginning in February 2012. [#65 at SOMUF ¶ 12]. Then, about June

---

[1] The Jefferson County District Court probated Mr. Kadingo's will in Case No. 2011PR0776. [#38 at ¶ 8]. Mr. Kadingo's estate consisted of a residence located in Arvada, Colorado, which served as Plaintiff's primary residence for several years. [*Id.* at ¶ 9]. On or about September 14, 2011, John Kadingo, as Personal Representative of Hubert Kadingo's estate, deeded a one-half interest in the residence to the Trust. [*Id.* at ¶ 10]. Plaintiff alleges that at the time of the transfer, she intended to use the property as her primary residence. [*Id.* at ¶ 22].

[2] Defendants respond that the regulation cited by Plaintiff also requires "the intent to return be placed in writing and no such evidence has been provided." *See* [#68 at 1].

2013, Plaintiff sold her residence and placed the proceeds from the sale in the Trust. John Kadingo's probate counsel informed Defendants of the sale on multiple occasions. [#65 at SOMUF ¶¶ 13–14; #66 at SOUF ¶ 17].

On July 16, 2014, Leanne Gardner, Trust Officer for the CDHCPF, informed John Kadingo that Plaintiff received an overpayment of $98,703.52 in Medicaid benefits, and that the CDHCPF sought only to recover that overpayment. [#65 at SOMUF ¶ 15; #66 at SOUF ¶ 20]. The Parties dispute whether this letter placed Plaintiff on notice that the CDHCPF considered the placement of the residence proceeds in the Trust as a transfer without fair consideration. *Compare* [#65 at SOMUF ¶ 15] *with* [#68 at 2]; *see also* [#68 at Statement of Additional Material/Undisputed Facts ¶¶ 1–6]. However, it is clear that Plaintiff's counsel and Ms. Gardner then exchanged correspondences regarding the July 16 letter. Plaintiff sought, and received, clarification of the CDHCPF's legal position with respect to Ms. Kadingo's Medicaid benefits. *See generally* [#66-6; #66-7; #66-8]. Then, on or about July 25, 2014, the Jefferson County Department of Human Services ("JCDHS") sent Plaintiff a notice (the "July 2014 notice"), citing that she was "overresourced" as a basis for denial and penalty, rather than that she had engaged in a transfer without fair consideration. The July 2014 notice was sent directly to InnovAge who did not forward it to Ms. Kadingo. [#65 at SOMUF ¶ 16].

John Kadingo appealed the July 2014 notice, and an Administrative Law Judge ("ALJ") conducted hearings on the matter on July 27, 2015,[3] and again on August 10, 2015, via telephone. [*Id.* at ¶¶ 17–18; #66 at SOUF ¶ 23]. During the July 27 hearing, the ALJ inquired of Plaintiff's counsel whether he would "want to go ahead and have a decision about the transfer

---

[3] Plaintiff asserts that the first hearing occurred on July 17, 2015; however, the transcript from that first hearing indicates that the proceeding took place on July 27, 2015. *See* [#66-10].

without fair consideration issue." [#66-10 at 27:14–18].[4] Following the hearings, the ALJ concluded that the July 2014 notice was defective for citing the incorrect ground for the agency's action; however, the ALJ considered the merits of the case based on a theory of transfer without fair consideration rather than Plaintiff being overresourced. [#65 at SOMUF ¶¶ 18–19; #66 at SOUF ¶ 26]. The Parties dispute whether it was Plaintiff's counsel who urged the ALJ to consider the Defendants' transfer without fair consideration theory. *Compare* [#65 at SOMUF ¶ 19] *with* [#66 at SOUF ¶¶ 24–25]. Nevertheless, Plaintiff substantively responded to Defendants' arguments. *See* [#66 at SOUF ¶ 25 (citing [#66-2 at 1; #66-11])]. The ALJ ultimately concluded that there was a transfer without fair consideration valued at $87,000, and the ALJ issued Plaintiff a future disqualification of benefits penalty, imposing a 14-month disqualification period (i.e., a transfer penalty) to run upon entry of the Final Agency Decision. [#65 at SOMUF ¶ 20; #66 at SOUF ¶ 26]. Plaintiff failed to timely appeal the ALJ's Initial Decision. [#65 at SOMUF ¶ 21; #66 at SOUF ¶ 27]. Accordingly, the CDHCPF issued a Final Agency Decision on October 30, 2015, affirming the ALJ's decision and activating the transfer penalty as of the date of its order. [#65 at SOMUF ¶ 15; #66 at SOUF ¶ 27].

Then, on June 14, 2016, the JCDHS issued a new notice (the "June 2016 notice") to Plaintiff citing transfer without fair consideration as the basis of its action, imposing the 14-month disqualification period set to run from July 1, 2016 to August 31, 2017. [#65 at SOMUF ¶ 22; #66 at SOUF ¶ 28]. Ms. Kadingo timely appealed the June 2016 notice. [#65 at SOMUF ¶ 22]. On October 25, 2016, the ALJ dismissed Plaintiff's appeal of the June 2016 notice because the ALJ had already heard the case and the CDHCPF already issued a Final Agency

---

[4] When citing to a transcript, this court uses the document number assigned by the ECF system, but the page and line numbers from the original transcript.

Decision on the matter. [*Id.* at ¶ 23]. To date, the CDHCPF has yet to issue a Final Agency Decision as to the June 2016 notice. [*Id.*].

## PROCEDURAL BACKGROUND

On December 11, 2015, Plaintiff commenced this action in the District Court of the City and County of Denver. *See* [#1 at 1]. Defendants filed their Notice of Removal in the federal district court for the District of Colorado on December 30, 2015, pursuant to 28 U.S.C. § 1331, because Plaintiff's Complaint alleged violations of her constitutional rights and sought declaratory relief under 42 U.S.C. § 1983.[5] [*Id.* at 2]. Following a 90-day stay of the proceedings [#22], Defendants responded to Plaintiff's Complaint with their first Joint Motion to Dismiss Plaintiff's Complaint on May 10, 2016. [#28]. However, on June 29, 2016, Plaintiff

---

[5] Plaintiff sues Defendant Birch, a state actor, in her official capacity. An official-capacity suit is, for all intents and purposes, to be treated as a suit against the entity, in this case, the state of Colorado. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The Eleventh Amendment bars suits against a state by its own citizens, and generally immunizes state defendants sued in their official capacities from liability for damages and retroactive equitable relief. *See Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995); *accord Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1232 (10th Cir. 2004) (recognizing that the Eleventh Amendment bars claims for retrospective declaratory relief, i.e., that the state official violated the plaintiff's constitutional rights in the past). However, it is well-settled that an exception to the Eleventh Amendment's general bar is a suit in which a plaintiff seeks to prospectively enjoin a state official from continually violating federal law. *Johns*, 57 F.3d at 1552 (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)). *See also Rounds v. Clements*, 495 F. App'x 938, 941 (10th Cir. 2012) (noting, "*Ex parte Young* permits suit against state employees for prospective relief whether the employee happens to be sued in his individual or official capacity") (citation omitted). Here, Plaintiff seeks declaratory relief, pursuant to § 1983, that Defendant Birch violated her federal and constitutional rights when imposing a transfer penalty on her Medicaid benefits. Though a fair reading of Plaintiff's Complaint and First Amended Complaint suggests that Plaintiff seeks retroactive declaratory relief, Plaintiff's Response to Defendants' Motion for Summary Judgment and counsel's comments at oral argument suggest that Plaintiff also seeks prospective relief. Accordingly, the court will construe Plaintiff's remaining claims against Defendant Birch as being alleged under the *Ex Parte Young* exception, particularly when Defendant Birch does not invoke Eleventh-Amendment Immunity. *See U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 942 (10th Cir. 2008) ("[A] court may raise the issue of Eleventh–Amendment immunity sua sponte but, unlike subject-matter jurisdiction, it is not obligated to do so.").

filed her First Amended Complaint ("FAC") [#38], the operative Complaint in this matter, and the court denied as moot Defendants' first Joint Motion to Dismiss in light of the FAC. [#39].

Then, on July 13, 2016, Defendants filed their Motion to Dismiss the FAC. [#42]. In ruling on the second Motion to Dismiss, the undersigned interpreted the FAC as alleging that Defendants violated: (1) 42 U.S.C. §§ 1396p(c)(2)(B)(i), 1396p(d)(2)(A), and 1396a(a)(18), with their policy and practice of interpreting a spouse's failure to elect against the decedent spouse's will as a transfer without consideration, infringing her rights to a testamentary trust that would be exempt from consideration under Medicaid ("Claim I"); (2) 42 U.S.C. § 1396p(c)(1)(E)(i)(I), by failing to treat Mr. Kadingo's testamentary trust as equivalent to an elective-share trust under Colorado law and assessing a transfer penalty ("Claim II"); (3) 42 U.S.C. § 1396p(c)(1)(D)(ii), because the ALJ ignored the state regulations and arbitrarily implemented the disqualification penalty in contravention of federal law by utilizing a start date that was not the first day of the month during or after the date in which assets were transferred ("Claim III"); (4) 42 U.S.C. § 1396a(a)(3) and the Fourteenth Amendment of the United States Constitution, because they provided Plaintiff deficient notice of the termination of her Medicaid benefits and failed to provide her a fair and impartial hearing, and seeking a declaration that 10 Colo. Code Regs. §§ 2505.10:8.057.8.D, E are unconstitutional ("Claim IV"); and (5) 42 U.S.C. § 1396p(c)(2)(C) with their policy and practice of applying transfer penalties when an individual fails to elect against their deceased spouse's will with reasons "other than to qualify for medical assistance" ("Claim V"). *See* [#38 at 15–26]. The claims also interweave facial challenges to the state Medicaid regulations, as well as particular challenges to the manner in which Ms. Kadingo's case was adjudicated. [#38].

On January 26, 2017, the undersigned granted in part and denied in part Defendants' Motion to Dismiss [#42].  *See* [#60].  Plaintiff's remaining claims are as follows:  (1) Claim I, but only to the extent it seeks to challenge Defendants' regulations, policies, and practices as violations of Plaintiff's federal rights under 42 U.S.C. §§ 1396p(d)(2)(A), 1396a(a)(18); (2) Claim IV in its entirety; and (3) Claim V, but only to the extent it seeks to challenge Defendants' regulations, policies, and practices as violations of Plaintiff's federal rights under 42 U.S.C. § 1396p(c)(2)(C) and not to the extent it seeks to challenge the equivalence of Mr. Kadingo's testamentary trust to that of an elective share trust.  [*Id.*].[6]

Following its ruling on the Motion to Dismiss, the court set the deadline for dispositive motions as February 24, 2017, but extended that deadline to March 10, 2017 upon motion by the Parties.  [#58; #60; #62].  Plaintiff moves for summary judgment in her favor on Claims I and IV [#65 at 1]; Defendants move for summary judgment in their favor on all three of Plaintiff's remaining claims [#66].  The court entertained oral argument on June 15, 2017, and took the motions under advisement.  [#67; #72].

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Carey v. U.S. Postal Serv.*, 812 F.2d 621,

---

[6] The court dismissed Claims II and III in their entirety.  [#60].

623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248.

If the moving party demonstrates an absence of evidence supporting an essential element of the opposing party's claims, the burden shifts to the opposing party to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. To satisfy this burden, the nonmovant must point to specific facts in an affidavit, deposition, answers to interrogatories, admissions, or other similar admissible evidence demonstrating the need for a trial. *Id.*; *Mares v. ConAgra Poultry Co.*, 971 F.2d 492, 494 (10th Cir. 1992). "[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting *Anderson,* 477 U.S. at 249, 252). In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

## ANALYSIS

### I.    Statutory Framework

The Medical Assistance Program ("Medicaid"), enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a federal-state cooperative program "designed to afford medical assistance to persons whose income and resources are insufficient to meet the financial demands of necessary care and services." *New Mexico Dep't of Human Servs. v. Dep't of Health & Human Servs. Health Care Fin. Admin.*, 4 F.3d 882, 883 (10th Cir. 1993); *accord Hern v. Beye*, 57 F.3d 906, 909 (10th Cir. 1995) (explaining that Medicaid provides assistance to at least

seven categories of recipients considered "categorically needy"-individuals).  As the Supreme

Court recognized,

> In structuring the Medicaid program, Congress chose to direct those limited funds
> to persons who were most impoverished and who—because of their physical
> characteristics—were often least able to overcome the effects of poverty. The
> legislative history of the 1965 Amendments makes clear that this group was not
> chosen for administrative convenience.  "These people are the *most needy* in the
> country and it is appropriate for medical care costs to be met, first, for these
> people."

*Schweiker v. Hogan*, 457 U.S. 569, 590 (1982) (footnote omitted) (emphasis added).

State participation in the program is optional; however, once a state elects to participate,

it must comply with the federal statutory scheme and regulations promulgated by the Secretary

of Health and Human Services.  *See Colorado Health Care Ass'n v. Colorado Dep't of Soc.

Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988).  Upon participation, "the federal government pays

at least 50% of the costs for patient care 'and, in return, [each] State pays its portion of the costs

and complies with certain statutory requirements.'"  *Reyes v. Hickenlooper*, 84 F. Supp. 3d 1204,

1207 (D. Colo. 2015) (quoting *Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268,

275 (2006)).

Colorado currently participates in the Medicaid program.  *Ramey v. Reinertson*, 268 F.3d

955, 957 (10th Cir. 2001).  As such, Colorado enacted the Colorado Medical Assistance Act "to

promote the public health and welfare of the people of Colorado by providing, in cooperation

with the federal government, medical and remedial care and services" to individuals and families

that cannot attain or retain such care and services themselves.  *See* Colo. Rev. Stat. § 25.5–4–102

*et seq.*  The CDHCPF is the sole state agency charged with administering the Medicaid program.

*Id.* § 25.5–4–104(1).

Pursuant to federal law, Colorado is required to provide full Medicaid services to categorically needy individuals; yet, it has the discretion to provide full coverage to additional "optional" segments of the State's population. *See Soskin v. Reinertson*, 353 F.3d 1242, 1245 (10th Cir. 2004) (citing 42 U.S.C. §§ 1396a(a)(10)(A)(i), (ii)). "In determining a person's eligibility for Medicaid, states must use reasonable standards that only factor in income and resources which are available to the recipient and which would affect the person's eligibility for [Supplemental Security Income ("SSI")]." *Brown ex rel. Brown v. Day*, 555 F.3d 882, 885 (10th Cir. 2009) (citing 42 U.S.C. § 1396a(a)(17)); *see also* 42 U.S.C. § 1396a(r)(2)(A)(i) (forbidding states from employing eligibility methodologies that would render an individual ineligible for Medicaid where that individual is eligible for SSI). Historically, in an effort to maximize their income that would not count as an "available asset," many applicants attempted to shield their assets through irrevocable trusts, prompting Congress to "reiterate[] its intent that Medicaid was designed to provide basic medical care for those without sufficient income or resources to provide for themselves and thus passed 42 U.S.C. § 1396a(k)." *Ramey*, 268 F.3d at 958; *see also Cohen v. Comm'r of Div. of Med. Assistance*, 668 N.E.2d 769, 771–72 (Mass. 1996) ("Thus, a grantor: was able to qualify for public assistance without depleting his assets; could once more enjoy those assets if he no longer needed public assistance; and, if such a happy time did not come, could let them pass intact pursuant to the terms of the trust to his heirs. The grantor was able to have his cake and eat it too.").

Section 1396a(k), known as the Medicaid qualifying trust ("MQT") statute, forbade the use of MQTs as a mechanism for sheltering assets for Medicaid eligibility purposes. *See* 42 U.S.C. § 1396a(k)(1). The MQT statute clarified that the amount "available" to a potential applicant included "the maximum amount of payments that may be permitted under the terms of

the trust to be distributed to the grantor[.]"  *Id.*  In recommending the passage of section

1396a(k), the House Committee on Energy and Commerce stated,

> The Committee feels compelled to state the obvious.  Medicaid is, and always has been, a program to provide basic health coverage to people who do not have sufficient income or resources to provide for themselves.  When affluent individuals use Medicaid qualifying trusts and similar "techniques" to qualify for the program, they are diverting scarce Federal and State resources from low-income elderly and disabled individuals, and poor women and children.  This is unacceptable to the Committee.

H.R.Rep. No. 265, 99th Cong., 1st Sess., pt. 1, at 72 (1985).

In 1993, Congress repealed section 1396a(k) and replaced it with "another statute even

less forgiving of such trusts."  *Ramey*, 268 F.3d at 959 (citing 42 U.S.C. § 1396p(d)).  Section

1396p(d) "added stringent criteria regarding the treatment of MQTs such as the inclusion of the

corpus and proceeds of various irrevocable trusts as countable resources."  *Id.*  Generally, section

1396p(d) requires states to consider assets contained in both irrevocable and revocable trusts,

unless explicitly exempted, when determining an individual's original or continuing eligibility

for Medicaid benefits.  42 U.S.C. § 1396p(d)(1).

Here, Plaintiff challenges Colorado's Medicaid eligibility regulations (Claims I and V),

as well as the process Defendants afforded her before initiating the 14-month disqualification

penalty on her receipt of benefits (Claim IV).  With the discussed statutory framework in mind,

the court now considers the Parties' arguments below.

**II.      Claims I and V**

As relevant here, in establishing methodologies for individual eligibility, Colorado's

Medicaid program must "comply with the provisions of section 1396p of this title with respect to

liens, adjustments and recoveries of medical assistance correctly paid, [] transfers of assets, and

treatment of certain trusts."  42 U.S.C. § 1396a(a)(18) (footnote omitted).  In Claims I and V,

Plaintiff challenges Defendants' regulation governing Transfers of Assets Without Fair Consideration ("TAWFC"), 10 Colo. Code Regs. § 2505–10:8.100.7.F., as violating her rights under section 1396p(d), which sets forth the rules for the treatment of trusts for determining Medicaid eligibility. 42 U.S.C. § 1396p(d)(1). This case does not involve review of whether the CDHCPF properly adjudicated Ms. Kadingo's case under otherwise valid regulations.[7]

Colorado's TAWFC regulation provides, in pertinent part,

If an institutionalized individual or the spouse of such individual disposes of assets without fair consideration on or after the look-back period, the individual shall be subject to a period of ineligibility for Long-Term Care services, including Long-Term Care institution care, Home and Community Based Services (HCBS), and the Program of All Inclusive Care for the Elderly (PACE).

10 Colo. Code Regs. § 2505–10:8.100.7.F.2. The following actions create a "rebuttable presumption" that a transfer was without fair consideration:

---

[7] Accordingly, the court does not consider Plaintiff's factual arguments specific to her (in)ability to elect against Hubert Kadingo's estate, including that the asset funding the Trust was her residence, an exempt asset, and that the nine-month window to elect against her husband's estate expired prior to the sale of the residence, the proceeds of which formed the Trust's corpus, or that the Trust "satisfied the elective share under Colorado law[.]" *See* [#65 at 9, 11, 12–13; #69 at 5–8, 8–9]. Essentially, Plaintiff seeks to argue that no transfer penalty should have been imposed because her failure to elect was not for the purpose of qualifying for Medicaid benefits. However, such arguments could have (and should have) been raised before the ALJ, because they speak directly to the Defendants' arguments during those proceedings, and the requisite four elements of claim preclusion are satisfied. *See generally Criste v. City of Steamboat Springs*, 122 F. Supp. 2d 1183, 1186 (D. Colo. 2000) (explaining that under Colorado law, claim preclusion bars the re-litigating of matter s that *could have been* addressed in a prior proceeding). Plaintiff's failure to raise these theories as exceptions to the ALJ's decision resulted in a "waiver of the right to judicial review of the final order of such agency." Colo. Rev. Stat. § 24–4–105(c). And, as Plaintiff aptly averred in her Response to Defendants' Motion to Dismiss, Claim I is distinct from the underlying ALJ proceedings and focuses solely on whether Defendants' regulation violates federal law. *See* [#47 at 5]. Thus, the court interprets these additional challenges to the TAWFC regulation as a conflict preemption challenge, i.e., that it was impossible to comply with the regulation (pursuant to Colorado's elective share and allowances statutes) and federal law, and that the TAWFC regulation poses an obstacle to the accomplishment of Congress' intent under section 1396p(d)(2)(A). *See, e.g.*, [#65 at 1 ("Claim I – state violation of federal law by requiring a spouse to elect their spousal share, foregoing their rights to be benefactors of exempt trusts")].

(ii)     Waiving a right to receive an inheritance;
(iii)    Preventing access to assets to which an individual is entitled to by diverting them to a trust or similar device.   This is not applicable to valid income trusts, disability trusts and pooled trusts for individuals under the age of 65 years.
(iv)     Failure of a surviving spouse to elect a share of a spouse's estate or failure to open an estate within 6 months after a spouse's death.
(v)      Failure to obtain a family allowance or exempt property allowance for an estate of a deceased spouse or parent.   Such allowances are presumed to be available 3 months after death.

*Id.* at § 2505–10:8.100.7.F.2.k(i), (iii)–(v).  Defendants based Ms. Kadingo's transfer penalty on subsections (iv) and (v), asserting that Plaintiff failed to elect her share of Mr. Kadingo's estate, *see* Colo. Rev. Stat. § 15–11–202, and failed to obtain a family or exempt property allowance, *see* Colo. Rev. Stat. §§ 15–11–403, –404.   Plaintiff asserts that Defendants' regulation impermissibly restricts her rights afforded under the federal Medicaid statute, respectively sections 1396p(d)(2)(A) (Claim I) and 1396p(c)(2)(C) (Claim V).

## A.     Claim I - Section 1396p(d) Treatment of Trust Amounts

Section 1396p(d)(1) provides that determination of an individual's Medicaid eligibility may include consideration of assets contained in certain trusts that the individual is the beneficiary of, unless the trust is exempted under subparagraph (d)(4).  42 U.S.C. § 1396p(d)(1), (d)(4); *see also id.* § 1396p(h)(1) (defining "assets" to "include[] all income and resources of the individual and of the individual's spouse").   "Subparagraphs (d)(1) and (d)(4) together establish two groups of trusts:  those to which (d)(3) applies and those to which it does not apply." *Sai Kwan Wong v. Doar*, 571 F.3d 247, 256 (2d Cir. 2009).   "Section 1396p(d)(3) does not merely 'allow' states to count trusts in determining Medicaid eligibility; *it requires them to do so*." *Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir. 2000) (emphasis in original) (footnote omitted) (noting that under subparagraph (d)(3), the trust's corpus and payments must be construed as an

individual's resources and income if the individual who establishes the trust is able to revoke or benefit from it).

There is no dispute that this case does not involve a trust exempted under subparagraph (d)(4). Rather, this case presents a question as to whether section 1396p(d)(2)(A) completely shields a testamentary trust's corpus from Medicaid eligibility considerations, including transfer penalties, regardless of what asset(s) form the corpus and when such assets were placed into the trust. To the court's knowledge, this is a matter of first impression in this District as well as in the State of Colorado.

### 1. Does Section 1396p(d)(3) Apply to Testamentary Trusts?

Section 1396p(d)(1) provides, "For purposes of determining an individual's eligibility . . . under a State plan under this subchapter, subject to paragraph (4), the rules specified in paragraph (3) shall apply to a *trust* established by such an individual." 42 U.S.C. § 1396p(d)(1) (emphasis added). Subsection (d)(2) then defines a "trust" established by an individual:

> For purposes of this subsection, an individual shall be considered to have established a trust if assets of the individual were used to form all or part of the corpus of the trust and if any of the following individuals established such trust *other than by will*:
>
> (i) The individual.
> (ii) The individual's spouse. . . .

42 U.S.C. § 1396p(d)(2)(A)(i), (ii) (emphasis added). *See also United States v. Villa*, 589 F.3d 1334, 1343 (10th Cir. 2009) ("In interpreting a statute, we start with its language . . . giving effect to its 'most natural reading.'"). By negative implication, testamentary trusts established by an individual or the individual's spouse are, therefore, not considered a "trust established by the Medicaid applicant" as defined by section 1396p(d)(1) and are expressly not subject to the rules specified in subparagraph (d)(3) that govern how trusts are treated for the purposes of

determining Medicaid eligibility. *See Pohlmann ex rel. Pohlmann v. Nebraska Dep't of Health & Human Servs.*, 710 N.W.2d 639, 644 (Neb. 2006). The Parties do not appear to dispute this conclusion. *Compare* [#65 at 7–9] *with* [#66 at 11–12; #68 at 6–7].

Plaintiff would have the court stop here, and conclude that, regardless of the composition of assets forming the trust and when those were included in the trust, any asset held within a trust formed by a will cannot be considered for the purposes of Medicaid forevermore. Defendants argue that simply because the testamentary trust cannot be considered as a trust established by the Medicaid applicant, it does not mean that the trust's assets cannot be examined to discern whether a transfer without fair consideration occurred. The court now turns to this more difficult inquiry.

2. **Does Colorado's TAWFC regulation violate Plaintiff's rights under section 1396p(d)(2)(A)?**

Plaintiff seeks summary judgment on Claim I, arguing that a testamentary trust is shielded from any consideration by the CDHCPF for Medicaid eligibility purposes under section 1396p(d)(2)(A), no matter what assets constitutes the corpus and, accordingly, Colorado's TAWFC regulation violates Plaintiff's federal rights. [#65 at 6]. Plaintiff relies on section 1396p(d)(2)(A)(ii) in reaching this conclusion, and contends that Defendants' consideration of any portion of the Trust's corpus as an asset of Ms. Kadingo necessarily violated her rights under section 1396p(d)(2)(A). [*Id.* at 7–9 (relying on *Pohlman*, 710 N.W.2d at 278)]. Further, Plaintiff argues that requiring her to elect against Hubert Kadingo's estate pursuant to Colo. Rev. Stat. § 15–11–202 *et seq.* ("elective share statute") deprives her of the benefit of section

1396p(d)(2)(A); thus, Defendants' imposition of a transfer penalty on Ms. Kadingo violates her federal rights. [*Id.* at 1, 9, 11, 13].[8]

Defendants disagree, and argue that section 1396p(d)(2)(A) "does not wholly exempt assets contained in a testamentary trust from eligibility consideration[.]" [#66 at 10–12]. Rather, the "other than by will" language only exempts testamentary trusts from the rules specified in subparagraph (d)(3), but not from the definition of "asset" under subparagraph (h)(1)(A) or from the transfer rules under 1396p(c)—the real basis for Plaintiff's 14-month disqualification penalty. [*Id.*]. Defendants continue that the "other than by will" language would act in a manner consistent with Plaintiff's position *only if* Colorado repealed its elective share and allowances statutes. [*Id.* at 13]. However, because those statutes entitle Plaintiff to those resources, they satisfy the definition of "assets" for Medicaid eligibility purposes and the "other than by will" language does not shield those resources from consideration simply because they form the corpus of a testamentary trust. [*Id.*].

For the following reasons, the court respectfully concludes that the TAWFC regulation does not violate Plaintiff's rights under section 1396p(d)(2)(A).

---

[8] Plaintiff also argues that the Trust has the same characteristics of a third-party beneficiary trust, i.e., that the trustee, not Plaintiff, has sole discretion to compel distributions; thus, the Trust's corpus does not constitute an "asset" available to Plaintiff. [*Id.* at 8 (discussing *Seidenberg v. Weil*, No. CIV.A.95-WY-2191-WD, 1996 WL 33665490, at *6 (D. Colo. Nov. 1, 1996))]. First, this argument appears to be factual in nature and should have been raised to the ALJ, rather than as a challenge as to whether Colorado's TAWFC regulation impermissibly violates federal law when applied to assets held in a trust established by will. Furthermore, under Colorado law, third party trusts are those established "with assets which are contributed by individuals other than the applicant or the applicant's spouse for the benefit of an applicant[.]" 10 Colo. Code Regs. § 2505–10:8.100.7.E(6)(d)(1). Though the Trust may have similar characteristics, by Plaintiff's own admission, the assets funding the Trust's corpus were her spouse's assets. [#65 at SOMUF ¶¶ 3–4]. Accordingly, the court finds this argument inapposite.

### i.      Statutory Text

In support of her position, Plaintiff relies on *Skindzier v. Commissioner of Social Services*, 784 A.2d 323, 336 (Conn. 2001). The *Skindzier* court considered whether the creation of a testamentary trust by the will of plaintiff's deceased husband itself could be considered as a disqualifying transfer without fair consideration to determine the initial eligibility of the plaintiff for Medicaid benefits. 784 A.2d at 325–26. In *Skindzier,* the testamentary trust was created on May 20, 1996, and over a year after, on December 31, 1997, Ms. Skindzier applied for Medicaid benefits because her income from Social Security, a pension, and the trust, rendered her "medically needy." *Id.* The Connecticut Department of Social Services ("Department") denied the plaintiff's application, determining that the creation of the trust itself was a disqualifying transfer of assets pursuant to section 1396p(c) and corresponding state regulations. But the trial court and Connecticut Supreme Court disagreed, the latter explaining, "[w]e cannot conclude that, having exempted testamentary trusts from the specific transfer of assets rules pertaining to trusts, Congress intended for the more general transfer of assets provisions of subsection (c) to apply." *Id.* at 331. Plaintiff urges this court to apply this general holding to this case.

This court declines to do so, because it finds *Skindzier* to be distinguishable from this case for several reasons, and the questions presented by the Parties in this action are more nuanced. *Cf. Martinez v. Ibarra*, 759 F. Supp. 664, 670 (D. Colo. 1991) (noting that federal courts are not bound by state court precedent when subject matter jurisdiction is premised on a federal question). First, unlike *Skindzier*, the CDHCPF did not consider the testamentary trust itself as an asset when considering Ms. Kadingo's initial eligibility for benefits. Rather, the CDHCPF approved Ms. Kadingo for Medicaid benefits in February 2012, but then sought to impose a transfer penalty on her continued receipt of benefits when, in June 2013 after the sale of

the marital home and the further funding of the Trust with half of the proceeds from that home, Plaintiff failed to elect against Hubert Kadingo's estate or receive her exempt property and family allowances (assets she was legally entitled to) in accordance with Colorado law. *See generally* [#66-5 at 1–2 (explaining that, pursuant to Colorado law and the TAWFC regulation, the amount of Plaintiff's elective share and exempt property and family allowances contained in the Trust "would be considered available for her care."); #65 at 10 (explaining that Plaintiff was legally entitled to 50% of Hubert Kadingo's estate and a total of $50,000 in allowances)]. Had the CDHCPF considered the creation of the Trust itself in February 2012 as a transfer without fair consideration for purposes of Plaintiff's initial Medicaid eligibility, the court may have found *Skindzier* more persuasive.[9] *But cf. Miller v. State Dep't of Soc. & Rehab. Servs.*, 275 Kan. 64 P.3d 395, 402–03 (Kan. 2003) (holding that the defendant could properly consider several assets contained in a testamentary trust when evaluating the plaintiff's initial Medicaid eligibility, because the plaintiff's failure to elect against her deceased husband's estate, pursuant to Kansas' elective share statute, in lieu of the testamentary trust was the equivalent of funding the testamentary trust with her own assets, i.e., a co-settled trust). But in this case, the Trust was not considered an asset for Medicaid eligibility, and the trigger for the CDHCPF's reconsideration of Ms. Kadingo's available assets was the sale of the marital home that further funded the Trust with her share of the proceeds from that sale.

Thus, the court now turns to whether the federal Medical statute precludes the CDHCPF from considering whether there has been a transfer without fair consideration when assets are placed within a testamentary trust after its creation. When interpreting a statute, the court begins

---

[9] The court also notes that *Skindzier* is inapposite because the Connecticut Supreme Court relied heavily on a Connecticut State Medicaid Manual interpreting section 1396p(c). *See Skindzier*, 784 A.2d at 332. No such agency interpretation is present in this matter.

its inquiry with the language of the statute itself—if the statute's language is plain and unambiguous, the court's function is to enforce it as written. *See In re Cowen*, 849 F.3d 943, 949 (10th Cir. 2017); *accord In re Escalera Res. Co.*, 563 B.R. 336, 346 (Bankr. D. Colo. 2017) (explaining that courts give undefined terms their ordinary meaning). This is true, "unless the plain language would 'produce a result demonstrably at odds with the intention of its drafters[.]'" *United States v. Dahda*, 853 F.3d 1101, 1113 (10th Cir. 2017) (ellipses omitted) (quoting *Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 820 (10th Cir. 1995)). Further, "it is well settled that [courts] are obliged to construe cognate statutory provisions harmoniously, if possible." *Fish v. Kobach*, 840 F.3d 710, 736 (10th Cir. 2016).

As discussed above, testamentary trusts are not considered a trust established by an individual, and are thus excepted from the rules of subparagraph (d)(3), which guide how trusts should be treated in determining Medicaid eligibility. But nothing in the statutory text of section 1396p suggests that once a testamentary trust is excluded as an exempt trust for the purposes of Medicaid eligibility, later-acquired assets placed in that Trust cannot be considered as *some other type of asset* for eligibility purposes at all simply because of where they are deposited. *See generally* 42 U.S.C. § 1396p. Rather, the structure of section 1396p is telling. Subsection (c) entitled "Taking Into Account Certain Transfers of Assets" instructs the state plan on how to treat certain transfers of assets by Medicaid applicants and their spouses—one mechanism by which an applicant might seek to qualify for public assistance without depleting her assets, for later enjoyment or for the benefit of her heirs, to the detriment of the most needy among us. *See id.* § 1396p(c). Subsection (d) entitled "Treatment of Trust Amounts" instructs the state plan on a different mechanism by which an applicant might attempt to shield her personal assets from Medicaid consideration—trusts. *Id.* § 1396p(d). These two subsections are distinct from each

other, and nothing in the statutory text suggests that Plaintiff can avoid the repercussions of certain types of transfers of assets simply by depositing the proceeds into an already-existing testamentary trust.

Nor does the court agree with Plaintiff that such an interpretation would render the testamentary trust exception "meaningless." *See* [#71 at 4]. To the contrary, to accept Plaintiff's argument would reward a "financial planning technique that potentially enriches heirs at the expense of poor people"—a result deemed unacceptable by Congress. H.R. Rep. No. 265, 99th Cong. 1st Sess., pt. 1 at 71–72 (1985). While the court recognizes that Ms. Kadingo may have had no nefarious intent in June 2013 when her marital home was sold, that issue should have been raised before the ALJ and this court declines to draw a generalization regarding the TAWFC regulation based on Ms. Kadingo's particular circumstances.

As mentioned, the Connecticut Supreme Court held that the exemption of testamentary trusts under section 1396p(d)(2)(A) necessarily exempted the creation of such trusts from being considered under the transfer of assets rules under section 1396p(c). *Id.* at 336. But the *Skindzier* case cannot be read as broadly as exempting all assets deposited within a testamentary trust, regardless of when such deposits were made or the nature of those assets. Consequently, the court sees no inconsistency in interpreting section 1396p(d)(2)(A) as not wholly shielding assets from consideration pursuant to the TAWFC regulation, promulgated in accordance with section 1396p(c), despite the "other than by will" language, especially when a transfer penalty is imposed *subsequent to* an applicant's approval for Medicaid benefits. *Cf. In re Estate of Faller*, 66 P.3d 114, 117 (Colo. App. 2002) (rejecting the argument that Colo. Rev. Stat. § 15–14–412.6(2) (prohibiting a court's authorization of trusts with the effect of qualifying the beneficiary for public assistance unless such trusts are income trusts, disability trusts, or pooled trusts) was

inapplicable to testamentary trusts under section 1396p(d)(2)(A), because the Colorado statutory scheme made no allowances for testamentary trusts).

Indeed, an examination of section 1396p(c) corroborates this conclusion. Subparagraph (c)(1)(A) reads,

> In order to meet the requirements of this subsection for purposes of section 1396a(a)(18) of this title, the State plan *must* provide that if an institutionalized individual or the spouse of such an individual (or, at the option of a State, a noninstitutionalized individual or the spouse of such an individual) disposes of assets for less than fair market value on or after the look-back date specified in subparagraph (B)(i), the individual is ineligible for medical assistance for services described in subparagraph (C)(i) [e.g., nursing facility service, a level of care in any institution equivalent to that of nursing facility services, or home or community-based services furnished under a waiver granted under subsection (c) or (d) of section 1396n].

42 U.S.C. § 1396p(c)(1)(A) (emphasis added). Subsequent subparagraphs direct states on how to calculate a period of ineligibility based on when the transfer occurred or how many months an institutionalized individual will be ineligible; what constitutes an "asset" for purposes of subsection (c) (e.g., annuities, funds used to purchase a promissory note, loan, or mortgage, or the purchase of a life estate in another's home); and how to account for multiple fractional transfers. *See id.* §§ 1396p(c)(1)(D)–(J). Further, subparagraph (c)(2) provides when transfer penalties are inapplicable, e.g., if the individual transfers her assets to her spouse for the spouse's sole benefit, or "a satisfactory showing is made to the State" that the individual intended to dispose of the assets for fair consideration or were transferred "exclusively for a purpose other than to qualify for medical assistance[.]" *Id.* § (c)(2)(B), (C).[10]

Other than these directives, Congress did not limit what additional circumstances or occurrences, including an applicant's failure to elect against her deceased spouse's estate,

---

[10] The court dismissed Claim I to the extent it relied on a purported violation of subparagraph (c)(2)(B)(i), because it was inapplicable to Plaintiff's eligibility determination. [#60 at 23-25].

constituted a transfer without fair consideration. *Cf. Keith*, 212 F.3d at 1193 ("Congress required that states generally count trust assets and income for purposes of determining Medicaid eligibility, but exempted income trusts from that requirement. Thus, Congress left the states free to decide whether and under what conditions to recognize such trusts."). Moreover, nothing under section 1396p(c) appears to limit *when* a state may impose a transfer penalty on an applicant's eligibility. In fact, it appears that states *must* impose a transfer penalty on a Medicaid applicant *or* participant should they improperly transfer assets for less than fair market value. 42 U.S.C. § 1396p(c)(1). And, nothing suggests that states are prohibited from imposing a transfer penalty on a Medicaid *participant* even if those assets are transferred to a testamentary trust that is otherwise excepted from consideration when determining an applicant's *initial* eligibility. Such an interpretation upholds the plain meaning of both sections 1396p(d)(2)(A) and 1396p(c).

For example, section 1396p(d)(2)(A) excepts testamentary trusts from consideration when a state determines an applicant's eligibility. *See* 42 U.S.C. § 1396p(d)(1) ("For purposes of determining an individual's *eligibility*"); *id.* § 1396p(d)(2)(A) ("[A]n individual shall be considered to have established a trust if assets of the individual were used to form all or part of the corpus of the trust and if any of the following individuals established such trust *other than by will*" (emphasis added)). Thus, the CDHCPF could not have denied Ms. Kadingo's application in February 2012 on the basis of assets contained in the Trust, nor could it deny her application based on a disqualifying transfer of assets under section 1396p(c) because any transfer would have come from Hubert Kadingo, not Plaintiff. However, in June 2013, upon the selling of Hubert Kadingo's residence, Ms. Kadingo was legally entitled to some of those proceeds under Colorado's elective share and allowances statutes, but those proceeds instead funded the Trust with the trustee maintaining absolute discretion over distributions. For this reason, these

proceeds satisfy the definition of "assets" under 1396p(h)(1)(A), because they constituted

Plaintiff's income that she was legally "entitled to but [did] not receive because of action—(A)

by the individual or such individual's spouse." 42 U.S.C. § 1396p(h)(1)(A). As such, the

CDHCPF considered Plaintiff's failure to receive these assets as a transfer without fair

consideration, consistent with its own regulations and the directive of section 1396p(c), i.e., that

states *must* impose transfer penalties on institutionalized Medicaid recipients that dispose of

"assets" for less than fair market value, subject to certain exceptions. *See id.* § 1396p(c)(1); *see*

*also Miller*, 64 P.3d at 402–03.

Under these circumstances, Defendants did not violate section 1396p(d)(2)(A), and the

TAWFC regulation does not violate section 1396p(d)(2)(A). This is because its application in

this case was consistent with both section 1396p(c) (requiring the imposition of transfer penalties

on institutionalized Medicaid recipients who dispose of assets for less than fair market

consideration) as well as section 1396p(d)(2)(A) given that the CDHCPF approved Ms.

Kadingo's Medicaid application in February 2012 and imposed a transfer penalty on *future*

benefits in response to the events of June 2013. Accordingly, a reasonable interpretation of

section 1396p(d)(2)(A) when considered in conjunction with subsection (c) and the TAWFC

regulation, does not wholly insulate assets of a testamentary trust under any and all

circumstances. *See Fish*, 840 F.3d at 736.

The court also finds that this holding upholds section 1396p(d)(2)(A)'s exception for

testamentary trusts while also limiting its breadth to comport with Congress' intent to ensure that

scarce federal resources are available to those most needy of applicants. *See Ramey*, 268 F.3d at

958–59. To adopt Plaintiff's interpretation of section 1396p(d)(2)(A) would create an exception

to section 1396p(c) and Colorado's corresponding statutes and regulations where one does not

exist.  A *recipient* would thus be able to transfer assets she is legally entitled to under the auspices of the testamentary trust exception while concomitantly avoiding any transfer penalty and enjoying both continued Medicaid benefits as well as the use of the transferred assets.  Such an interpretation is at odds with Congress' intent in enacting section 1396p(d).[11]  *See Dahda*, 853 F.3d at 1113

### ii.  Conflict Preemption

Relatedly, the court concludes that section 1396p(d)(2)(A) does not preempt the TAWFC regulation.  Congress may preempt state and local laws pursuant to the Supremacy Clause of the United States Constitution.  U.S. Const. art. VI, cl. 2.  This can occur in three situations: (1) express preemption—the federal statute clearly expresses Congress' intent to preempt state law; (2) field preemption—the federal statute regulates a field so pervasively that there is no room for states to supplement it; and (3) conflict preemption—the federal statute and the state statute are completely irreconcilable such that it is impossible to comply with both or the state statute poses an obstacle to the "accomplishment and execution of the full purposes and objectives of Congress."  *Sw. Bell Wireless Inc. v. Johnson Cty. Bd. of Cty. Comm'rs*, 199 F.3d 1185, 1190 (10th Cir. 1999) (quotations and citations omitted).

As noted, the court construes Plaintiff's arguments that she could not elect against Mr. Kadingo's estate given the creation of the Trust as a conflict preemption challenge to the TAWFC regulation.  *See generally* [#65 at 1].  Accordingly, the court must determine whether it is physically impossible to comply with both state and federal law, *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1098 (10th Cir. 2017), or whether Colorado law stands as an obstacle to "the

---

[11] Importantly, the court's holding in no way discredits Plaintiff's alleged need for Medicaid benefits or implies that Plaintiff attempted to impermissibly procure such benefits. Unfortunately, this case presents a unique factual scenario, and its resolution illustrates the lengths Congress has gone to protect scarce federal resources.

accomplishment and execution of the full purposes and objectives of Congress[,]" *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1196 (10th Cir. 2010) (internal quotations and citation omitted). In assessing the latter, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). However, the "Supreme Court has recognized a presumption against implied conflict preemption" out of "respect for the States as independent sovereigns in our federal system." *Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011) (internal quotations omitted) (quoting *Wyeth v. Levine,* 555 U.S. 555, 565 n.3 (2009)). Here, Plaintiff fails to demonstrate that federal and state law conflict. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1143 (10th Cir. 2010) (explaining that the party raising preemption bears the burden of showing that the laws actually conflict).

To start, it is not physically impossible to comply with Colorado law and federal law. As discussed, had the corpus of the Trust not contained Ms. Kadingo's elective share of Hubert Kadingo's estate and her family and exempt property allowances, the TAWFC regulation would have been inapplicable. Certainly, Ms. Kadingo could have elected against Hubert Kadingo's estate while simultaneously enjoying the benefits of section 1396p(d)(2)(A) under the right circumstances. Next, as explained, there is no evidence to suggest that Colorado law poses an obstacle to the achievement of Congress' purposes and objectives under section 1396p(d)(2)(A) or otherwise. Indeed, the court's conclusion *supra* is consistent with congressional intent.

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") reached a similar conclusion when considering a conflict preemption challenge to Colorado's Medicaid statute that established the parameters for a valid income trust for purposes of Medicaid

eligibility.  *See Keith*, 212 F.3d at 1193.  In *Keith*, Mr. Keith applied for Medicaid benefits in 1999; not soon after, he executed an income trust to prevent his pension income from rendering him ineligible for Medicaid benefits.  *Id.* at 1191.  The Mesa County Department of Social Services denied his Medicaid application, determining that his income trust was invalid under Colorado law because his pension income exceeded the average cost of nursing home care in his region.  *Id.* at 1191–92.  Mr. Keith alleged, *inter alia*, that Colorado's income trust statute was invalid under the doctrine of conflict preemption.  The Tenth Circuit disagreed.

First, the Tenth Circuit held that Mr. Keith's argument, that it was impossible to comply with section 1396p(d) and Colo. Rev. Stat. § 15–14–409.7,[12] was without merit.  *Id.* at 1193. The Tenth Circuit explained, "[t]he fact that it is possible to comply with one law while failing to comply with another does not render compliance with both impossible[;]" rather, "anyone who, unlike Mr. Keith, receives monthly pension income less than the average monthly cost of nursing home care in his region will meet the eligibility standards of both federal and Colorado law."  *Id.* Second, the Tenth Circuit held that Colo. Rev. Stat. § 15–14–409.7 was not an obstacle to the accomplishment and execution of the purposes and objectives of Congress.  Instead, the legislative purpose of section 1396 was clear:  "Congress required that states generally count trust assets and income for purposes of determining Medicaid eligibility, but exempted income trusts from that requirement.  Thus, Congress left the states free to decide whether and under what conditions to recognize such trusts."  *Id.* at 1193.

A similar conclusion is appropriate here.  While it may have been factually impossible for Ms. Kadingo to comply with Colorado's elective share and allowances statutes *and* section 1396p(d)(2)(A) in this case given the chronology of events, this does not mean that it is *always*

---

[12] The current Colorado statute governing income trusts is Colo. Rev. Stat. § 15-14-412.7.

impossible to comply with both.[13]  Moreover, though Congress excepted testamentary trusts from the rules specified under section 1396p(d)(3), there is no indication that Congress intended to wholly exempt the corpus of such trusts from consideration under other provisions of federal Medicaid or state Medicaid law.  Therefore, the court concludes that section 1396p(d)(2)(A) does not preempt the TAWFC regulation.

***

Based on the foregoing, the court respectfully concludes that Defendants did not violate Plaintiff's federal rights under section 1396p(d)(2)(A) by imposing a transfer penalty on her Medicaid benefits.  Accordingly, the court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment as to Claim I.

### B. Claim V - Section 1396p(c) Taking Into Account Certain Transfers of Assets

Section 1396p(c)(1)(A) provides that, for purposes of section 1396a(a)(18), a state's Medicaid program "must provide that if an institutionalized individual or the spouse of such an individual [] disposes of assets for less than fair market value . . . the individual is ineligible for medical assistance for services described in subparagraph (C)(i) . . . ."  Section 1396p(c)(2)(C), however, provides that an individual shall not be *ineligible* for medical assistance to the extent that

> a satisfactory showing is made to the State (in accordance with regulations promulgated by the Secretary) that (i) the individual intended to dispose of the assets either at fair market value, or for other valuable consideration, (ii) the assets were transferred exclusively for a purpose other than to qualify for medical assistance, or (iii) all assets transferred for less than fair market value have been returned to the individual.

42 U.S.C. § 1396p(c)(2)(C).

---

[13]  As discussed above, Ms. Kadingo should have raised her case-specific challenges to the imposition of a transfer penalty to the ALJ.

Claim V seeks to invalidate 10 Colo. Code Regs. §§ 2505–10:8.100.7.F.2.j.ii, iii, iv and v and all actions taken by Defendants thereunder, because these provisions violate her rights under section 1396p(c)(2)(C). Specifically, the FAC alleges that Defendants' "policy and practice [] requiring Ms. Kadingo to elect against her husband's will cannot be a transfer without fair consideration pursuant to 42 U.S.C. § 1396p(c)(2)(C) because they were for an attempt to conform law rather than to make her eligible for Medicaid."[14] [#38 at ¶ 107].

Defendants move for summary judgment on Claim V because 10 Colo. Code Regs. § 2505–1:8.100.7.F mirrors section 1396p(c)(1)(A). [#66 at 17]. Moreover, Defendants argue that the TAWFC regulation contains a nearly identical exception to that of section 1396p(c)(2)(C). [#66 at 19-20]. Specifically, 10 Colo. Code Regs. § 2505–10:8.100.7.G.7.a incorporates section 1396p(c)(2)(C)'s exception that an individual can make a satisfactory showing to the State that the transfer without fair consideration was for a purpose "other than to qualify for medical assistance." [*Id.*]; 42 U.S.C. § 1396p(c)(2)(C)(ii); 10 Colo. Code Regs. § 2505–10:8.100.7.G.7.a (explaining that the transfer without fair consideration presumption is rebutted upon a convincing showing that the transfer was exclusively for purposes other than to qualify for Medicaid).

Plaintiff does not explicitly respond to Defendants' arguments, nor does Plaintiff move for summary judgment in her favor on Claim V. *See* [#70 at 5-6]. And it is not this court's duty to make arguments for litigants who have not made them on their own behalf, particularly when Plaintiff is represented by counsel. *See United States v. Davis*, 622 F. App'x 758, 759 (10th Cir.

---

[14] Again, the court declines to entertain any argument to the effect that Ms. Kadingo's transfer of assets was for purposes other than qualifying for Medicaid as she should have raised such claims to the ALJ.

2015); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).

The TAWFC regulation provides, in pertinent part,

> The presumption that an asset was transferred to establish or maintain Medicaid eligibility or to avoid the medical assistance estate recovery program *is rebutted* only if the individual or individual's spouse demonstrates *by providing convincing evidence that the asset was transferred exclusively for some other purpose* and the reason for the transfer did not include Medical Assistance eligibility or avoidance of medical assistance estate recovery.

10 Colo. Code Regs. § 2505–10:8.100.7.G.7.a (emphasis added). The court agrees with Defendant: this language mirrors that of section 1396p(c)(2)(C). There is no evidence to suggest that the TAWFC regulation violates section 1396p(c)(2)(C). Accordingly, the court **GRANTS** Defendants' Motion for Summary Judgment as to Claim V.

## III.     Claim IV - Section 1396a(a)(13)

In addition to challenging Defendants' regulations concerning an individual's eligibility for Medicaid, Claim IV raises a due process challenge to the procedures utilized by Defendants when imposing a transfer penalty on Plaintiff's future receipt of Medicaid assistance. Specially, Claim IV alleges that Defendants violated section 1396a(a)(3) that requires all state Medicaid programs to provide an opportunity for a fair hearing before the state agency if the agency denies an individual's claim for assistance. 42 U.S.C. § 1396a(a)(3). Claim IV asserts that Defendants violated Plaintiff's rights to a fair hearing by providing faulty notice of the reasons for the denial, and, somewhat relatedly, that Defendants' regulations, 10 Colo. Code Regs. §§ 2505–10:8.057.8.D and E, concerning the scope of the ALJ's authority to entertain certain challenges to the CDHCPF's regulations, are unconstitutional. *See* [#38].

However, in moving for summary judgment, Plaintiff focuses solely on the allegations that Defendants violated her due process rights under the Fourteenth Amendment and section

1396a(a)(3), given that Defendants provided Plaintiff a defective termination of benefits notice and, despite finding this to be true, the ALJ considered the merits of Defendants' transfer without fair consideration argument. [#65 at 13–14]. Accordingly, the court considers the narrow issue of whether Defendants deprived Ms. Kadingo of her due process rights for purposes of summary judgment, and declines to address any facial challenge to the constitutionality of 10 Colo. Code Regs. §§ 2505–10:8.057.8.D, E given Plaintiff's failure to construct any arguments on the subject.[15]

Conversely, Defendants move for summary judgment because: (1) Plaintiff fails to allege that either Defendant violated her constitutional rights pursuant to an official policy, custom, or practice; and (2) notwithstanding the absence of a policy or custom, Plaintiff's due process rights were not violated as she had sufficient notice of the reason for imposing the transfer penalty and a fair opportunity to contest that reason. *See* [#66 at 24–31]. Because the court concludes that Defendants' first argument warrants summary judgment in their favor as to Claim IV, it focuses on it.[16]

---

[15] Defendants' Motion for Summary Judgment argues that Plaintiff's inability to challenge the constitutionality of CDHCPF's regulations at the ALJ hearings does not deprive her of due process. *See* [#66 at 32 (citing 10 Colo. Code Regs. § 2505–10:8.057.8.D and E)]. However, Plaintiff offers no response to this argument.

[16] Nonetheless, based on the record before the court, it does not appear that Defendants violated Plaintiff's due process rights. The process owed to Plaintiff in a termination of benefits proceeding is the opportunity to be heard, meaning she receives timely and adequate notice of the reasons her benefits were terminated and an effective opportunity to defend herself. *See Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). Here, Plaintiff's counsel at the time, Mr. Steinhoff, exchanged correspondences with Ms. Gardner, Trust Officer for the CDHCPF, wherein Ms. Gardner clarified the CDHCPF's position that a transfer without fair consideration occurred, *see* [#66-5 at 2; #66-6 at 2; #66-7 at 3–4; #66-8 at 2]; he then responded to Defendants' transfer without fair consideration arguments in Plaintiff's briefs filed before the ALJ, *see* [#66-2 at 1; #66-11]; and also responded (and apparently urged the ALJ to consider) Defendants' transfer without fair consideration arguments at two separate ALJ hearings, despite the defective notice, *see* [#66-10 at 2–3; #66-11]. Moreover, Plaintiff failed to timely file exceptions to the ALJ's decision thereby waiving "the right to judicial review of the final order of such agency."

## A.    Policy or Custom

Plaintiff sues both Defendant Johnson, in her official capacity as director of the JCDHS, and Defendant Birch, in her official capacity as Executive Director of the CDHCPF.  In doing so, Plaintiff is essentially suing Jefferson County (a municipality) and the State of Colorado, respectively.  *See Mocek v. City of Albuquerque*, 813 F.3d 912, 932 (10th Cir. 2015).  "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's 'policy or custom' must have played a part in the violation of federal law." *Hafer*, 502 U.S. at 25 (internal quotations and citations omitted).

Jefferson County, as a municipality, and the State of Colorado, cannot be held liable under a theory of *respondeat superior*; there must exist an official policy or custom that directly causes the alleged injury.  *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (holding in a case against a state official in his official capacity, "the entity's 'policy or custom' must have played a part in the violation of federal law"); *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) ("To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right. . . . This requirement is satisfied if the plaintiff shows that the municipality was the 'moving force' behind the injury alleged." (internal quotations and citations omitted)).  This is true whether a plaintiff seeks monetary relief *or* prospective relief such as an injunction or declaratory judgment.  *Los Angeles Cty., Cal. v. Humphries*, 562 U.S. 29, 31, 34, 36-37 (2010).  Proof of a single incident of unconstitutional

---

Colo. Rev. Stat. § 24–4–105(c).  Finally, *Weaver v. Colorado Department of Social Services*, 791 P.2d 1230 (Colo. App. 1990) is distinguishable, because, unlike the defective notices in *Weaver*, Plaintiff ascertained the regulatory standards governing the termination of her benefits and responded to those standards.  *Cf. Martinez*, 759 F. Supp.  at 670 ("Since jurisdiction is premised on a federal question, this court is not bound by the decision in *Weaver*.").

behavior is insufficient. *See Nielander v. Bd. of Cty. Comm'rs of Cty. of Republic, Kan.*, 582 F.3d 1155, 1170 (10th Cir. 2009).

In her Response to Defendants' Motion for Summary Judgment and at oral argument, Plaintiff conceded, "certainly this case presents an individual violation." [#73 at 27:23–24]. But counsel for Plaintiff went on to argue that (1) there was an "endemic problem with the State of Colorado in providing constitutionally adequate notices [*id.* at 27:12–15], and that (2) she need not allege the existence of an official governmental policy or custom to maintain her due process claim because she was not seeking damages. *See* [#69 at 16–19; #73 at 27:1–8]. Rather, Plaintiff argues that Defendants' violation of the Colorado Court of Appeals case *Weaver v. Colorado Department of Social Services*, 791 P.2d 1230 (Colo. App. 1990), constitutes a violation of both state and federal law. [*Id.* at 17]. The court respectfully disagrees.

Whether Plaintiff seeks retrospective monetary relief or prospective relief under § 1983, she must adduce sufficient evidence at the summary judgment phase to establish that there is at least a genuine issue of material fact that Defendant Johnson violated her constitutional due process rights pursuant to a municipal policy or custom. *See Lawrence v. Sch. Dist. No. 1*, 560 F. App'x 791, 794 (10th Cir. 2014). *See also Reynolds v. Giuliani,* 506 F.3d 183, 191 (2d Cir. 2007) (holding in a Medicaid case, "[w]e join several of our sister circuits in adopting the view that *Monell's* bar on *respondeat superior* liability under § 1983 applies regardless of the category of relief sought"). Ms. Kadingo simply has proffered no admissible evidence that Jefferson County's issuance of a defective notice is anything more than a singular incident.

Plaintiff contends that in other cases, courts have granted relief to plaintiffs in challenges to Medicaid procedures pursuant to § 1983 without "widespread pattern, practice or custom." [#69 at 18–19]. None of the cases cited by Plaintiff includes a holding that a plaintiff can pursue

a § 1983 claim against a state official, in her official capacity, without identifying a policy or custom, and the case law holds otherwise. *See Graham*, 473 U.S. at 166. Plaintiff further cites no authority, and this court finds no justification to distinguish the State from a municipality in a case seeking injunctive relief rather than damages. Accordingly, this court concludes that Plaintiff must adduce sufficient evidence at this stage to create a genuine issue of material fact that Defendant Birch violated her constitutional due process rights pursuant to a state policy or custom. Whether Defendants violated *Weaver's* holding—that defective termination of benefits notices sent to Mr. Weaver violated *his* due process rights—at a maximum, provides only a single incident of a constitutional violation. And despite her arguments that "there is an endemic problem," and her reference to "House Bill 171126, Medicaid Appeal Review," [#73 at 28–29], the arguments of Plaintiff's counsel regarding the State's issue regarding Medicaid Appeal Notices is simply insufficient at this juncture. Accordingly, Plaintiff's due process claim against Defendants necessarily fails, and Defendants are entitled to summary judgment in their favor as to Claim IV.

Therefore, the court **GRANTS** Defendants' Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment as to Claim IV.

## CONCLUSION

Based on the reasons stated herein, **IT IS ORDERED** that:

(1)      Plaintiff's Motion for Summary Judgment [#65] is **DENIED**;

(2)      Defendants' Motion for Summary Judgment [#66] is **GRANTED**;

(3)     Summary Judgment be entered in favor of Defendants and against Plaintiff, and that Plaintiff's remaining claims be **DISMISSED with prejudice**;[17] and

(4)     The Clerk of the Court **ENTER** Final Judgment accordingly, with each party bearing its own costs and fees.[18]

DATED: August 14, 2017                    BY THE COURT:


                                          s/ Nina Y. Wang
                                          Nina Y. Wang
                                          United States Magistrate Judge

---

[17] In the FAC and again at oral argument, Plaintiff requested that this court remand the matter back to the Denver District Court where the action was originally filed. [#38 at 29; #73 at 36:15–37:3]. However, Plaintiff brought all of her claims in this action pursuant to § 1983, and at no point filed a motion to remand the case back to Denver District Court. The Local Rules of this District required Plaintiff to file a separate motion to remand, if she sought that relief. D.C.COLO.LCivR 7.1(d). In addition, because this court had original jurisdiction pursuant to 28 U.S.C. § 1331 over *all* of Plaintiff's claims, it properly adjudicated those claims on the merits, and while a district court has the discretion to remand any state causes of action implicated in the pleadings once all federal claims have been dismissed, no state law claims exist in this matter. *See Dahn v. United States*, 127 F.3d 1249, 1255 (10th Cir. 1997). Accordingly, any request for remand by Plaintiff is **DENIED**.

[18] While costs should generally "be allowed to the prevailing party," Fed. R. Civ. P. 54(d)(1), the district court may in its discretion decline to award costs where a "valid reason" exists for the decision. *See, e.g., In re Williams Securities Litigation-WCG Subclass*, 558 F.3d 1144, 1147 (10th Cir. 2009) (citations omitted). Because the questions presented in this matter were unique and a matter of first impression, this court declines to award fees to Defendants. *See Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 459 (10th Cir. 1995) (noting that there is no abuse of discretion when the district court denies fees where the "issues are close and difficult," or where the prevailing party is only partially successful).